JOHN PALMER AND OTHERS, EXECUTORS OF JULIA A. ANDERSON, APPELLANTS.

It may well be doubted whether an administrator is authorized, in any case, to give credit, upon the sale of real estate of the intestate for the payment of his debts, under an order of license of a Court of Probate; and whether, if he does so, he is not chargeable with the price, as money in his hands for the creditors and others who may be entitled to it.

Equity gives to the vendor of real estate a lien upon the land for the purchase money unpaid in the absence of any agreement or security having the effect to surrender it.

But if the vendor take a distinct and independent security for the purchase money, other than the mere personal obligation of the vendee, as if he take a bond of the vendee with sureties, or his promissory note with endorsers, the lien is gone; this being considered evidence that he did not trust to the estate, as a pledge for his money.

If, on a sale of real estate of an intestate, under an order or license of a Court of Probate, the administrator gives credit for a part of the purchase money, and takes endorsed notes of the vendee as security for the payment of the same, thereby parting with the equitable lien upon the land, and any portion of the amount so secured is lost by the subsequent insolvency of the parties to the notes, the administrator will be personally answerable to the estate for such loss; and this, though when the notes were given, the parties to them were in good credit, and reputed to be responsible, and there has been no *laches* in using the legal means for collecting them, and although, in consequence of the credit given, the price obtained for the property, exceeded what it would have brought on a sale for cash, by an amount greater than the amount lost by the failure to collect the notes.

APPEAL from the decree of the Judge of Probate for Wayne county. The decree and facts upon which it was based, as agreed upon, were as follows: In 1836, Julia A. Anderson, as administratrix of her late husband, John Anderson, (who died intestate, leaving no children, and largely indebted,) acting under an order or license of the Court of Probate authorizing a sale of certain real estate of the intestate for the payment of his debts, sold certain out lots and tracts of land in and near the city of Monroe,

mentioned in the order, on the terms of one third cash down, and the balance payable in two equal annual instalments, with interest, and secured by promissory notes of the several purchasers, each having two responsible endorsers. On these terms, sales were made to different persons to the amount of $3,565.38, which was all collected by the administratrix except two items, viz : $108 33, being the last instalment due on a purchase to the amount of $325.00, made by Norman D. Curtis, which instalment was secured by the promissory note of Curtis, with two endorsers ; and also $346.68, being the last instalment due on a like purchase to the amount of $1,040, made by James Q. Adams, which instalment was also secured by a like note of the purchaser, with two endorsers. These two items, amounting to $455.01, were lost by the insolvency of the makers and endorsers of the notes.

Mrs. Anderson having died before her administration of the estate of her husband was closed, the appellants, executors of her last will and testament, rendered her account as administratrix, in which the above sum of $455 01, was deducted from the aggregate amount of the sales of real estate, and credit was given for the balance only, —the amount actually collected.      •

A hearing was had before the judge of probate for the settlement of the account, at which the above facts appeared ; and it was there further testified by Robert McClelland, Henry Chipman and Lucius Abbott, that the real estate, in their opinion, sold for one third more, in consequence of the credit given, than it would have brought had it been sold for cash down ; and the two latter witnesses testified, also, that at the time of the sale, both the makers and endorsers of the notes above mentioned, were in good credit and reputed to be responsible; that suits were commenced against them on the maturing of the notes, and with due diligence prosecuted to judgment; that legal

diligence had been used by the administratrix to recover the money, but to no purpose; and that nothing had been or could be collected from the parties to the notes, as, soon after the sale, their real property depreciated in value. This testimony was uncontradicted before the judge of probate, and is now submitted as a part of this case.

The judge of probate decreed that the estate of John Anderson should be credited with the two items above mentioned, amounting to $455.01. From which decree this appeal was taken to this Court.

*A. D. Fraser* and *Henry Chipman,* for the appellants.

*H. T. Backus,* contra.

GOODWIN, J. delivered the opinion of the Court.

1. The first question which arises in this case, and which has been argued by counsel, is, had the administratrix authority to sell the real estate on a credit, or rather to give credit upon the sale? It is insisted, on the part of the appellees, that she had not; and that, having done so, it was at her own hazard, and the estate is not chargeable with the loss. On the other hand, it is contended that, in executing the authority to sell, granted by the court under the statute, the administratrix had a discretion to give credit, if, in her judgment, the interests of the estate would be subserved by it, and if she exercised this discretion in good faith, with proper diligence, and without negligence. The solution of this question depends upon the construction of the statutes of 1833, under which these proceedings were had, and the rules which the law applies to such powers as that conferred.

It is to be remembered that, while personal property of the intestate passes to the administrator upon his appointment, and vests in him absolutely, to be applied and distributed, to be sure, in due course of administration, the

real estate does not. It descends immediately to the heirs; their title, however, being subject to be devested, in case it should be required, and a sale of it authorized, for payment of the intestate's debts. He cannot, as such, enter upon it, or maintain any action in regard to it. He can only sell and convey it upon being licensed to do so, in the exigency specified in the statute, when the personal property, which is the primary fund for the payment of debts, is insufficient for that purpose. Laws 1833, p. 291, 292, 308, 310; 3 Mass. R. 258; 4 Id. 354; 5 Id. 240; 3 Cow. R. 299; 6 Conn. R. 373.

In examining the sections of the act under which the license was obtained, (Laws 1833, p. 291–'2,) in conjunction with the other provisions in respect to the powers and duties of administrators, there is much force, certainly, in the position assumed by the counsel for the appellees, that the administrator, as such, cannot give credit on such sale, except at his own hazard entirely. The power is a special one, conferred under the statute for a specific object—the payment of the debts of the intestate,—and limited, as to the quantity to be sold, to what shall be deemed necessary for that object, if the whole be not required; the Court, however, having power to order the sale of more, if a partial sale would be injurious to the residue. The outstanding debts are to be paid; and they are generally due, and must be presumed to be, or about to become so, when application is made to sell the real estate, and devest the title and possession of the heirs; and the object of the sale would seem to require prompt payment of the money upon it. Powers and trusts of this nature, for the benefit of others, are, by the general law, required to be executed promptly, or with all reasonable despatch. By the statutes referred to, time is given to the administrator to look into and ascertain as to the solvency of the estate, and he is privileged from answering to suits for the

period of one year for this purpose; and, if he finds it insolvent, upon representation of that fact, a commission is appointed to receive and audit the claims, and the whole estate, personal and real, (except that which the statute bestows upon the widow in such case,) is to be converted into money and distributed among the creditors, *pro rata.* After the expiration of the year, if this be not done, and the debts remain unpaid, he may be sued, and judgment had against the estate, and both the real and personal estate subjected to execution on the judgment.    And, in the very next section to that providing for the levy of real estate on an execution against him, (Laws 1833, p. 294,) it is provided, that, when he "shall neglect, or unreasonably delay to raise money out of the estate, by collecting debts due to such estate, and selling the personal estate, or real estate, (if need be, and he has power, or can obtain license to sell the same,) or shall neglect to pay what he has in his hands, and by such neglect or delay shall subject the estate, real or personal, to be taken in execution, the same shall be deemed waste, and unfaithful administration."    Now, upon view of this section, and the consequences contemplated to the administrator at the expiration of the year, if the property has not been converted into money for the payment of the debts,—especially, taken in connection with the other provisions, and the general rule above adverted to,—it may well be doubted whether an administrator is authorized at all to give credit upon the sale of real estate in such exigency; and whether, if he does so, he is not chargeable with the price, as money in his hands for the creditors and others who may be entitled to it.    The oath which has been adverted to in argument, required of the executor or administrator, that he will use his utmost endeavors to dispose of the estate in such manner as will produce the greatest advantage to all persons interested therein, and that, without any sinister views whatever, I

do not consider as conferring any power, but as designed to secure diligence and good faith, in the use of all those means which, upon such sales, may be resorted to by a diligent and faithful man, to enhance the price; of which the most material would be a full disclosure of all the circumstances which may be in his knowledge, going to show the situation, advantages, and value of the property,—circumstances important to a purchaser in the exercise of his judgment in bidding.

But, although the reasons may be strong in favor of the proposition that, in case of such a sale upon credit, the price would be, immediately upon the execution of the conveyance, money in his hands to be administered; and the debt of the purchaser created by the obligation, would be to him in his own right; yet, from the view which we entertain of the second question presented, we do not deem it necessary to decide, and to go so far as to say, that in no case, and under no circumstances, can an administrator exercise such a discretion, without becoming personally chargeable.

2. The second question is, admitting that the administratrix might exercise a discretion to sell on credit, without becoming so chargeable, was the discretion in this case properly exercised? Let it be remembered that the title to the land was not in her, but in the heirs, and that she executed a special authority in making the sale for a special purpose. It was competent to retain a lien on the land for the portion of the purchase money unpaid. Further, in the absence of any agreement or security having the effect to surrender the lien, equity gives it. It may be waived by the acts of the parties showing that it was not intended to be retained. If the vendor take a distinct and independent security for the purchase money, it has been held the lien is gone,—such a security having been considered evidence that he did not trust to the estate as

a pledge for his money; though it has been held that the obligation of the purchaser alone, is not such a security, but that a bond with sureties is ; and so of notes. 2 Sugd. on Vend. 62, 65 ; 2 Story Eq. Jur. 464, 475; 2 Madd. Ch. 129, 130; 6 Ves. R. 752; 15 Id. 329 ; *Gilman* v. *Brown*, 1 Mason's R. 212.

Was the administratrix justified in parting with the lien in this case, and taking personal security only ?

It is insisted on the part of the appellants, that the duties of the administratrix are those of a trustee; and that the doctrines governing the relation of trustee and *cestui que trust* are applicable. The administratrix, in relation to the personal property of the estate, is certainly a trustee. So also as to avails of real estate sold under the statute ; and she may also be said to be so in relation to the execution of the power and license for sale of the real estate. It is further contended that, in the management of a trust, the law requires good faith, including honesty and diligence carefully applied, a departure from which is a breach of trust, for which the trustee is liable; and that no more than this is required. In the case cited of *Hester* v. *Hester*, 1 Dev. Ch. R. 331, this doctrine is sustained. In that case, it is held that a breach of trust supposes that there is a rule for the government of the trustee; that, where a rule is prescribed by the creator of the trust, it must be adhered to; that, "in the absence of one prescribed by him, the law requires good faith, which includes not only what is understood by honesty and integrity, but care, diligence and attention, and, in matters of judgment and discretion, that they should be carefully applied." And, in the case of *Bryan* v. *Mulligan*, 2 Hill's Ch. R. 364, the rule is laid down, "that executors, administrators, and others acting in a fiduciary character, are bound to manage the funds committed to their care, with the same care and diligence that a prudent man would bestow upon his

own concerns;" that, when a loss arises, the question is, " whether it has happened from casualties against which no one is expected always to guard, or from his want of care and circumspection."

We are not without authority and precedent more directly in point. In 2 Madd. Ch. 134, it is laid down that two principles appear to have been adopted in regard to the liability of executors, who, it is said, are trustees: 1. That, with a view not to deter persons from undertaking a trust, the court is extremely liberal, and will so determine as not to strike a terror into mankind, acting for the benefit of others, and not their own. 2. That care must be had to guard against an abuse of trust; and various decisions are cited in support of the doctrine. After giving various cases in which they have or have not been held personally liable, and the principles applicable, on page 146, it is laid down that " executors are not justified in laying out money on *personal security;* and though trustees were expressly empowered to lend the trust money on real and personal security, it was held they were not justified in lending it upon bond to a trader; they must, in such cases, take the best security; nor can they, without great reason, permit debts due upon personal security to remain longer than is absolutely necessary, especially where *infants* are concerned. If they neglect to call in money due on bond, they will be liable." And the cases referred to support the doctrine of the text. In the case of *Wilkes* v. *Steward*, Coop. Ca. 6, the will empowered the defendants, executors, to lay out the legacy in *the funds,* " or on such other security as they could procure and think safe." *Sir William Grant*, M. R. held, "that the defendants had no power to lay out the money on personal security." In a note to the case of *Harden* v. *Parsons*, 1 Eden's Eq. R. 145, 150, relied on by the appellants' counsel, it is stated that "it is now, however, clearly settled

that executors or trustees cannot lend money on personal security;" overruling the doctrine of the case itself.

The case of *Adye* v. *Feuilletian*, 1 Cox's Ch. Ca. 24, was, in some of its circumstances, very analogous to this; especially in regard to the equities insisted on. Upon a bill filed by infant legatees to carry the trusts of a will into execution, accounts were directed of the personal estate; and, the master having made his report, the defendant excepted thereto, "for that the master had not allowed him in his discharge a sum of £1,000, which the defendant and another of the executors had lent on bond in Jamaica, the obligor having died insolvent." It appeared that, at the time the money was lent, the obligor was in good circumstances; that, *the interest being* 8 *per cent*, the estate had been increased to the amount of £5,000, by the executors having lent money in like manner; and that the testator had constantly employed his money in that way during his lifetime. It was contended for the defendant, precisely as it is here, that "an executor is not liable for losses, if he did with the testator's property as a prudent man would have done with his own;" and, further, that the estate had been increased £5,000 by the mode of laying out the money, and that it was therefore hard that the executor should suffer for the deficiency. Lord *Loughborough* says, "An executor must always be answerable for an infant's money. The particular circumstances cannot weigh. The executor has certainly behaved very honorably in this case; but it would be dangerous to break through the general rule." And the Lord Commissioner adds, "The court will always discourage lending trust money on private security, though larger interest may be gained. It becomes a species of gambling." And the exception was overruled.

In the case of *Holmes* v. *Dring*, 2 Cox's Ch. Ca. 1, where £300 was lent by the executors on bond with surety, and

the obligors were in very ample circumstances at the time, but afterwards became insolvent, Lord *Kenyon*, Master of the Rolls, in deciding, says: "The bond of several persons cannot be distinguished from the bond of one person, as applied to this case.   It was never heard of, that a trustee could lend an infant's money on private security.   This is a rule that should be rung in the ears of every person who acts in the character of trustee ; for such an act may very probably be done with the best and honestest intention, yet no rule in a court of equity is so well established as this."

In *Powells* v. *Evans*, 5 Ves. R. 839, Lord *Alvanley* held the executor responsible when he permitted, negligently, and without good reason, money to remain longer than was absolutely necessary upon personal security taken by the testator in his lifetime.

In *Smith* v. *Smith*, 4 John. Ch. R. 284, Chancellor *Kent* reviews many of the English decisions, and gives it as the modern rule, that "an executor must not even rest on personal security; and, if he does, it is at his own hazard." He comments, however, on its strictness, and refrains from deciding whether, in possible cases, he might not depart from it.

Justice *Story*, 2 Com. on Eq. § 1274, after commenting on this subject, and referring to the principles and cases, says: "So, if a trustee should invest trust money in mere personal securities, however unexceptionable they might seem to be, in case of any loss by the insolvency of the borrower, he would be held responsible; for, in all cases of this sort, courts of equity require security to be taken on real estate, or on some other thing of permanent value."

This doctrine seems now too well established to be questioned.   And, if it is to be applied to investments made by executors and trustees, of money in their hands,

much more, *a fortiori*, is it applicable to administrators and executors transferring the title of the estate, and voluntarily parting with that lien which the law would otherwise create, and thereby depriving the creditors and *cestui que trust* of that security. In doing so, they must be held personally chargeable. The provision of the section, (L. 1833, p. 293, § 2,) authorizing, when a part only of the real estate is wanted for the payment of debts, and a partial sale would injure the remainder, a sale of the whole, requires that, in certain cases, the surplus of the proceeds shall be put at interest on good securities. If the money had been actually received by the administratrix, and, under this section, loaned on such securities as were taken for the price of the land sold in this case, a personal liability, under the rule laid down, would certainly have been the consequence. Much more is it so under the case presented.

It was urged in argument, that the administratrix could not have sold for the same price and retained the lien ; that the purchasers bought to sell again, and required an unincumbered title. These alleged facts do not appear in the case ; and, if they did, under the rule laid down in the books, it would seem to make no difference; for the executor is not authorized, even for the benefit of the estate, to run any such hazard. He cannot so speculate, except at his own risk.

It was said that, at the period referred to, it was customary generally to sell real estate upon credit, and we were asked to take judicial notice of this as part of the history of the times. If we should do so, we must also take notice of the fact, that then, and ever since, and before, to the period when the memory of man runneth not to the contrary, it was the general usage, here and elsewhere, upon selling real estate on credit, to retain security upon it for the purchase money, until paid. The

Roman law gave such a lien in the absence of any express agreement, both in reference to personal and real property; and from that, it is suggested by Justice *Story*, it was probably introduced in respect to real property, into our equity system.

It has been urged upon us that the administratrix, by selling on credit as she did, obtained, in the enhanced price, an excess of some $1,500, being much more than the deficiency ; that consequently there is, even if the amount of the loss be charged upon it, a gain to the estate of several hundred dollars, and that it is, therefore, inequitable that the estate of the administratrix should be charged with this loss. The full force of this is felt, and the insisting upon it does seem to be a hungry demand of the pound of flesh. But we cannot depart from the established rules of law, to relieve the hardship of a particular case. We can only say, while we apply them, as was said by the Master of the Rolls, in the case of *Vez* v. *Emery*, 5 Ves. R. 144, we wish that we could, consistently with the rules of the Court, hold the administratrix fully justified. That was a case in behalf of infants, where the rule adopted compelled the executor to pay £200 out of his own pocket. " This is," said he, " a most ungracious demand; and if the plaintiffs were adults, they would not have thought it proper." Yet, in this case, for aught that appears, if the administratrix had retained security upon the estate sold, which common prudence would seem to have required, no loss, it is presumed, would have accrued. She saw fit, in her discretion, with fair and upright motives, no doubt, to do otherwise. The rule of law was violated ; the hazard was her own ; and her estate must bear the loss. The decree of the Probate Court must be affirmed.

*Decree affirmed.*